IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| DAVID L. BIELFELDT, et al.,<br>    Plaintiffs,<br><br>v.<br><br>LEE C. GRAVES, et al.,<br>    Defendants. | Case No. 1:15-cv-01419-JEH |

## Order and Opinion

Before the Court are cross motions for summary judgment, as well as Defendant, Elm One Call Locators, Inc.'s ("ELM"), motion for summary judgment on Counts I and IX filed at the invitation of the Court. (D. 124, 127, 128, & 136). Specifically, Plaintiffs David Bielfeldt and Karen Wales seek summary judgment on the counterclaim against them for declaratory judgment filed by Defendants ELM and James Bourazak. The Defendants seek summary judgment in their favor on the same counterclaim. ELM also seeks summary judgment in its favor on Counts I and IX. For the reasons stated, *infra*, ELM's motion for summary judgment on Counts I and IX is GRANTED (D. 136). Because the grant of that motion resolves the only federal claims in this case and the Court, as explained, *infra*, declines to exercise supplemental jurisdiction over the remaining state law claims, the remaining motions for summary judgment are MOOT. (D. 124, 127, & 128).

# I
## A

The undisputed facts relevant to ELM's motion for summary judgment on Counts I and IX are as follows.[1]

ELM was incorporated on June 5, 2003. At the time of incorporation, Bielfeldt and Graves were each issued 50% of the Class A Voting Shares of ELM. ELM, Bielfeldt, and Graves entered into a Class A Stock Restriction Agreement ("SRA") in 2003. Bielfeldt and Graves accepted appointments to the board of directors and, during the time relevant to this case, Graves was the CEO of ELM.

In 2013, Graves contributed approximately $1.8 million to ELM to avoid ELM going into default on its liability insurance and to allow it to meet its payroll obligations. After doing so, Graves sent an email to Bielfeldt on January 16, 2014 stating:

> As we discussed, our shortfall was in the $1.8m to $2m range.
>
> Since you left the meeting with this issue unresolved and I did not hear back from you on options and the immediate threat of not being able to pay our liability insurance down payment or meet payroll, I personally put up $1.8m. The threat of not making payroll for hundreds of employees and families as well as defaulting on our liability insurance requirements was unthinkable.
>
> While I have done this to solve our immediate problem, I can't do this alone. Therefore, we have a couple of options. First and preferred option, is for you to come up with $900K to equalize our contributions and risk. If this option is not preferred then let's have your ownership valued and work on an exit strategy. This is not the same business model we acquired over 10 yrs ago but we have survived and are having something to talk about. If you have another option, please let

---

[1] These facts are taken from the various filings of the parties on cross-motions for summary judgment indicating facts that are not in dispute.

me know as I value our friendship and would like to see this worked out.

(D. 126 at ECF pp. 3-4).

Bielfeldt responded to this email the same day with, "Let's talk . . ." *Id.* Thereafter, Bielfeldt and Graves executed a Fourth Amendment to Business Loan Agreement wherein Graves was given the authority, in light of his pledge of capital to:

> borrow money in the name of the Corporation, sign execute and deliver promissory notes or other evidence of indebtedness of the Corporation; and, endorse, assign, transfer, mortgage or pledge bills receivable, real estate or other property now owned or hereafter owned or acquired by the Corporation as security for sums borrowed.

*Id.* at 5.

Various communications occurred between Bielfeldt and Graves, but Bielfeldt never took action to address the additional capital Graves put into ELM. Finally, on May 12, 2014, Graves sent a letter to Bielfeldt on company letterhead. That letter in its entirety is as follows:

**ELM Locating & Utility Services LLC**

60 State St., Suite 201
Peoria, Illinois 61602
Telephone: (309) 673-7648
Fax: (309) 673-7768

CERTIFIED MAIL

May 12, 2014

Mr. David Bielfeldt
4737 N. Grandview Drive
Peoria Heights, IL 61616

RE: ELM One Call Locaters, Inc.

Dear David:

This letter constitutes notice of a Major Event pursuant the stockholder agreement of One Call Locators, Inc., specifically Article VIII, Section 8.02 (viii), Major Events, "the issuance of debt or equity interests of the Company...". As you are aware, I have provided $1.84M in additional equity into the Company booked on February 28, 2014 and I am required to provide $60K in additional Capital prior to July of this year as required by The First State Bank of Illinois financing and demand. This Equity contribution results in an increase in my Equity of One Call Locaters. This letter is also addressed to Karen Wales in that she is affected similarly pursuit to Article IV.

Pursuant to Article VIII, Section 8.03 (a) please consent to the Major Event identified above, based on the bank demand and infusion of an additional $1.9M of Capital into ELM One Call Locaters.

Regards,

Lee C. Graves
CEO

Cc: Karen Wales
James Bourazak
Matt Decker

3

(D. 126-6).

Bielfeldt received this letter but did not provide a written response to it. Nor did he ever provide written consent in connection with the "major event" set forth therein. On June 12, 2014, thirty days passed since the May 12 letter was sent.

Section 8.02 of the SRA addresses "major events" as follows:

> Major Events. The written consent of Bielfeldt and Graves shall be required for the following (hereinafter, each a "Major Event"): (i) the sale, lease, transfer or other disposition by the Company of all or substantially all the assets of the Company, (ii) the merger or consolidation of the Company; (iii) refinancings of indebtedness of the Company, (iv) the sale or lease of any assets of the Company outside the ordinary course of business, (v) the approval of the annual plan and capital expenditure budget of the Company or amendment thereof, (vi) the incurrence or payment of any capital expenditure or other expense not contemplated by such approved annual plan or amendment thereof, (vii) the hiring or termination of any officer of the Company, (viii) *the issuance of debt or equity interests in the Company*, (ix) any voluntary liquidation or dissolution of the Company, (x) any split, combination or reclassification of any Stock, (xi) any amendment or restatement of the Articles of Incorporation or By-Laws of the Company, (xii) the entry into or amendment by the Company of any contract or agreement which has a term in excess of one (1) year or which provides payments to or by the Company in excess of $100,000, (xiii) any acquisition of the Company in one transaction or series of transactions with a purchase price in excess of $500,000; or (xiv) issuances of stock options, phantom stock rights or stock appreciation rights or other equity interests to employees and directors.

(emphasis added) (D. 126-3 at ECF p. 13).

Regarding deadlocks for "major events", Section 8.03 of the SRA provides:

> If either Bielfeldt or Graves requests in writing that the other consent to a Major Event, consent shall be deemed given if the requesting party receives no written response within thirty (30) days after the receipt of such written request by the other party. If the other party rejects such written request within thirty (30) days after receipt of

5

> such written request, a deadlock shall be deemed to exist. Within twenty (20) days after the deadlock is so determined to exist, Graves shall by notice to Bielfeldt in writing either (i) exercise the conditional option set forth in Section 8.03(c) below to purchase all of the Stock of Bielfeldt (and his Permitted Transferees) or to sell all of the shares of Stock owned by Graves (and his Permitted Transferees) to Bielfeldt, in each case, for the Purchase Price per share of Stock (defined in Section 8.03(b) below), or (ii) consider the issue with respect to which there was a deadlock to have been resolved in Bielfeldt's favor and cause the Company to act or decline to act accordingly. If Graves does not so notify Bielfeldt in writing within such twenty (20) day period, Graves shall be deemed to have elected clause (ii) above.

*Id.*

Thereafter, Graves took action to issue himself an additional $1.84 million of equity in ELM. While the Plaintiffs dispute whether this attempt was in fact effective, they cannot dispute that Graves attempted to do so; had he not at least attempted to do so, none of them would be here before this Court in the first place.

**B**

Graves's attempt to issue himself the equity in ELM is the central issue in this case, as the parties acknowledge in their cross motions. Although Plaintiffs filed an 11-count complaint, only two of those counts sound in federal subject matter jurisdiction. Specifically, Count I alleges a violation of 15 U.S.C. § 78j(b) and Count IX alleges a civil RICO violation. The remaining nine counts of the complaint all sound in Illinois law, as do the counterclaims.

Regarding ELM's motion for summary judgment on the federal counts, ELM argues that the undisputed facts demonstrate that, pursuant to the terms of the SRA, Bielfeldt is deemed to have consented to Graves's issuance of an additional $1.84 million equity interest in ELM. This consent, according to ELM, entitles it to summary judgment on the federal counts, as the Plaintiffs cannot establish one or more elements of the federal claims given Bielfeldt's consent. The

Plaintiffs respond that summary judgment on the federal counts is premature and that a finding that Bielfeldt is deemed to have consented to the issuance of the equity at issue does not preclude them from establishing the necessary elements on the federal claims.

II

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323- 24 (1986). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183(7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250.

# III
## A

The Court first finds that the undisputed facts demonstrate that Bielfeldt is deemed to have consented to the issuance of equity at issue here. The SRA's language is clear and unambiguous; it defines the issuance of equity as a "major event." It requires the "written consent" of Bielfeldt and Graves for such major event and dictates what will happen when one of the two parties requests in writing the consent of the other party. (D. 126-3 at ECF p. 13). First, if the receiving party does not provide a written response within thirty days of receipt of a request for consent, "consent shall be deemed given." On the other hand, if the requested party rejects the request for consent in writing, then a "deadlock" shall be deemed to exist for which the SRA provides very specific procedures for resolving said deadlock.

The May 12, 2014 letter specifically provided Bielfeldt with notice of a major event, citing to the issuance of equity in ELM as that major event going so far as noting that Graves provided $1.84 million of additional equity into ELM booked on February 28, 2014 and that said contribution accordingly increased Graves's equity. The letter, citing the SRA consent procedures, also formally requests consent of Bielfeldt to the major event. It is undisputed that Bielfeldt never consented to the major event, but he also never rejected in writing the request for consent. Accordingly, pursuant to the SRA, after thirty days passed from Bielfeldt's receipt of the May 12, 2014 letter, he is deemed to have consented to the issuance of the equity to Graves by operation of the SRA.

Having found consent to the transaction at issue in this case, the Court will now address how that consent affects the federal claims in this case.

**B**

To establish a cause of action for securities fraud as alleged in Count I under Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5), promulgated under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), "a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and [that] (6) that reliance proximately caused plaintiff's injuries." *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 859 (N.D. Ill. 2002) (quoting *In re HealthCare Compare Corp. Securities Litig.*, 75 F.3d 276, 280 (7th Cir. 1996)).

The undisputed facts establish that no Defendant made a misstatement or omission of material fact in connection with the events leading up to and in the May 12, 2014 letter. Bielfeldt knew that Graves had contributed additional capital to ELM in order to prevent it from defaulting on its liability insurance and to allow it to meet its payroll obligations. Graves gave Bielfeldt ample opportunity to match Graves's contribution to maintain their relative ownership interests in ELM. Bielfeldt did nothing in response; he neither contributed additional capital to ELM nor gave Graves anything of value to offset the capital he provided to ELM. When Graves finally invoked the SRA in the May 12, 2014 letter, Bielfeldt again chose to do nothing. By the clear, unambiguous terms of the SRA, his inaction is deemed to constitute consent to the action proposed by Graves in the May 12, 2014 letter.

Plaintiffs make much of what happened *after* Bielfeldt was deemed to have consented to the issuance of additional equity to Graves. They complain that certain corporate formalities, Illinois law, the SRA, and ELM by-laws were not followed in the issuance of the equity to Graves. Even assuming such complaints are valid, failure to follow such state law or contractual requirements do not amount to securities fraud as alleged in Count I. Moreover, none of these alleged

9

facts are material to the Plaintiffs' securities fraud claim in this case. No misstatement or omission of material fact precipitated Bielfeldt's deemed consent to the issuance of equity to Graves. Having consented to that event, his complaints about *how* the issuance was effectuated are, at best, claims sounding in claims arising under Illinois law and *not* securities fraud claims.

The Plaintiffs' argument that summary judgment on Count I is premature is also without merit. Both parties agree that the central issue in this case revolves around the issuance of equity to Graves. Moreover, all parties agree in their motion for summary judgment and cross-motion for summary judgment that the facts are undisputed and ripe for decision on summary judgment as it relates to the issuance of equity to Graves; they merely disagree regarding the legal consequences of those undisputed facts. Finally, whatever additional discovery might reveal, that discovery cannot alter the undisputed facts which have been agreed upon by the parties in their filings and upon which this Court relies herein—facts, again, put forward by the parties here as undisputed. The Plaintiffs chose to file their cross-motion for summary judgment at this stage in the case. While they may not have anticipated the impact of the undisputed facts on the federal claims in this case, that failure does not necessitate additional discovery to look for a dispute concerning facts the parties agree are *undisputed*.

Given that the Plaintiffs cannot establish an essential element of their securities fraud claim in Count I, ELM is entitled to summary judgment on Count I.

## C

To establish civil liability for a RICO violation as alleged in Count IX, a plaintiff must show that the defendant (1) conducted (2) an enterprise through (3) a pattern (4) of racketeering activity. *See e.g., Peterson v. H & R Block Tax Services, Inc.*, 22 F. Supp. 2d 795, 802 (N.D. Ill. 1998). Section 1961(5) of RICO provides the

statutory definition of a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5); *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986).

As the Defendants argue, there is no "pattern" of or racketeering activity here which could give rise to liability under RICO. As already discussed, the core dispute in this case revolves around the issuance of equity to Graves—a single activity. Moreover, no acts of racketeering were committed in connection with that issuance. The Defendants committed no fraud, misstatements, or omissions concerning the issuance of equity to Graves.

Bielfeldt knew exactly what was happening regarding the issuance of stock to Graves. He knew Graves contributed capital to prevent ELM from going under. He knew Graves asked—even preferred—that Bielfeldt also pony up and share the burden so as to maintain their relative equity interests in ELM. Bielfeldt chose not to. Not content to contribute $1.84 million in additional capital to ELM while Bielfeldt contributed nothing, Graves then invoked the SRA and provided Bielfeldt notice of exactly what he intended to do to remedy this inequity. Bielfeldt could have objected. He did not, and, by the terms of the SRA—an agreement to which Bielfeldt agreed to be bound—his silence became consent.

The undisputed facts demonstrate neither a pattern of nor racketeering activity, and ELM is entitled to summary judgment on Count IX.

## IV

Having concluded that ELM is entitled to summary judgment on the only federal claims in this case, the Court turns to the question of whether it should exercise supplemental jurisdiction over the remaining claims in this case, which all arise under Illinois law. The basis for the Court's subject matter jurisdiction in this case is 28 U.S.C. § 1331, which grants federal district courts original

11

jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This jurisdiction stems from Count I and Count IX of the complaint, as previously noted. The Court's jurisdiction over all other claims and counterclaims lies in its supplemental jurisdiction, which is codified in 28 U.S.C. § 1367(a), whereby the jurisdiction of a federal district court is extended to all claims that are so related to a claim within the court's original jurisdiction that they form part of the same case or controversy within the meaning of Article III of the Constitution. *See City of Chicago v. International Coll. of Surgeons,* 522 U.S. 156, 164–65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (citing 28 U.S.C. § 1367).

Although 28 U.S.C. § 1367(a) authorizes federal courts to exercise supplemental jurisdiction over state-law claims, this does not mean that federal courts must exercise jurisdiction in all cases. *See International Coll. of Surgeons,* 522 U.S. at 172, 118 S.Ct. 523. Rather, supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right[.]" *Id.* District courts can decline to exercise jurisdiction over supplemental state law claims for a number of valid reasons and should "deal with cases involving [supplemental] claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the [supplemental] jurisdiction doctrine." *Id.* at 172–73, 118 S.Ct. 523.

This is an appropriate case for the Court to decline to exercise supplemental jurisdiction, given that the federal claims have been resolved and the case originated in state court. This case should go back from whence it came. This case has wound itself through state court, this Court, and now possibly back through state court. All of this litigation could have been avoided had Bielfeldt simply utilized the procedure he contracted to use as set forth in the SRA; namely, he could have objected to the "major event" described in the May 12, 2014 letter instead of remaining silent. He has sought through this litigation to be relieved of

12

the consequences of that decision. Perhaps the state court will relieve him of those consequences, but this Court will not.

All remaining claims and counterclaims are accordingly dismissed pursuant to 28 U.S.C. § 1367.

## IV

For the reasons stated, *supra*, ELM's motion for summary judgment on Counts I and IX (D. 136) is GRANTED. All other counts of the complaint and counterclaims are DISMISSED. Any other pending motions are therefore MOOT. This case is TERMINATED.

*It is so ordered.*

Entered on October 26, 2017

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE